1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

REBEKAH A. LONG,

               Plaintiff,

     v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

               Defendant.

CASE NO.     C07-5211FDB-KLS

REPORT AND
RECOMMENDATION

Noted for April 4, 2008

Plaintiff, Rebekah A. Long, has brought this matter for judicial review of the denial of her

application for disability insurance benefits.  This matter has been referred to the undersigned Magistrate

Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by

Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the

remaining record, the undersigned submits the following Report and Recommendation for the Honorable

Franklin D. Burgess's review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is forty-two years old.[1] Tr. 31.  She has a general equivalency diploma and past

---

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to
Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

1   work experience as a flagger, nursery laborer, barrista, teacher's aide, stocker, and waitress. Tr. 85, 97,

2   122, 127.

3         On July 18, 2002, plaintiff filed an application for disability insurance benefits, alleging disability

4   as of January 31, 2001, due to depression and schizophrenia. Tr. 19, 77-79, 84, 403.  Her application was

5   denied initially and on reconsideration. Tr. 33-34, 44, 50.  A hearing was held before an administrative law

6   judge ("ALJ") on April 21, 2004, at which plaintiff, represented by counsel, appeared and testified, as did

7   plaintiff's mother and a vocational expert. Tr. 342-99.  On August 5, 2004, the ALJ issued a decision

8   determining plaintiff to be not disabled, finding specifically that she was capable of performing other jobs

9   existing in significant numbers in the national economy. Tr. 19-30.

10         The Appeals Council denied plaintiff's request for review on June 24, 2005. Tr. 5, 403.  Plaintiff

11   appealed the ALJ's decision to this Court, which, on March 22, 2006, remanded this matter to the

12   Commissioner for further administrative proceedings. Tr. 419, 426-29.  Pursuant to the Court's order, the

13   Appeals Council remanded this matter back to an ALJ. Tr. 420, 422-24.  A second hearing was held before

14   the same ALJ on January 17, 2007, at which plaintiff, represented by counsel, appeared and testified, as

15   did a medical expert and a different vocational expert. Tr. 466-519.

16         On March 2, 2007, the ALJ issued a decision, determining plaintiff to be not disabled, finding

17   specifically in relevant part:

18         (1)   at step one of the sequential disability evaluation process,[2] plaintiff had not
                 engaged in substantial gainful activity since her alleged onset date of disability;
19

20         (2)   at step two, plaintiff had "severe" impairments consisting of depression, a
                 personality disorder, obesity, and asthma/allergic sensitivity to dust mites and
21               cattle;

22         (3)   at step three, none of plaintiff's impairments met or equaled the criteria of any
                 of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; and

23         (4)   at step four, plaintiff had the residual functional capacity to perform medium
24               work, with certain other non-exertional limitations, which did not preclude her
                 from performing her past relevant work.

25   Tr. 403-18.  It does not appear from the record that the Appeals Council assumed jurisdiction of the case.

26   20 C.F.R. § 404.984.  The ALJ's decision therefore became the Commissioner's final decision after sixty

27   _____

28         [2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See
     20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability
     determination is made at that step, and the sequential evaluation process ends. Id.

1   days. Id.

2         On April 30, 2007, plaintiff filed a complaint in this Court seeking review of the ALJ's decision.

3   (Dkt. #1-#3).  The administrative record was filed with the Court on August 1, 2007. (Dkt. #11).  Plaintiff

4   argues the ALJ's decision should be reversed and remanded to the Commissioner for an award of benefits

5   or, in the alternative, for further administrative proceedings for the following reasons:

6         (a)     the ALJ erred in evaluating the medical evidence in the record;

7         (b)     the ALJ erred in finding that plaintiff's mental impairments did not satisfy the
                  criteria for 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04C;
8
          (c)     the ALJ erred in assessing plaintiff's credibility;
9
          (d)     the ALJ erred in finding plaintiff capable of returning to her past relevant work;
10                and

11        (e)     the hypothetical question the ALJ posed to the vocational expert was defective.

12  The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set

13  forth below, recommends that while the ALJ's decision should be reversed, this matter should be

14  remanded to the Commissioner for further administrative proceedings.

15                                    DISCUSSION

16        This Court must uphold the Commissioner's determination that plaintiff is not disabled if the

17  Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole

18  to support the decision.  Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is

19  such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson

20  v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than

21  a scintilla but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir.

22  1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than

23  one rational interpretation, the Court must uphold the Commissioner's decision.  Allen v. Heckler, 749

24  F.2d 577, 579 (9th Cir. 1984).

25  I.    The ALJ's Evaluation of the Medical Evidence in the Record

26        The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

27  medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in

28  the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions

of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

1        Plaintiff argues at the outset that the overwhelming medical opinion evidence in the record shows

2   she was more limited in terms of mental functioning than found by the ALJ.  She points out that the ALJ

3   "rejected at least in part the opinions of every examining and non-examining psychologist and

4   psychiatrist" regarding the severity of her mental condition. (Dkt. #12, Plaintiff's Opening Brief, p. 15).

5   Plaintiff further asserts that "[w]hen the ALJ's evaluation of a claimant's mental condition conflicts with

6   the opinions of ten examining and non-examining mental health professionals, substantial evidence does

7   [not] support it." (Id. at p. 16, citing Lester, 81 F.3d at 830-31; 20 C.F.R. § 404.1527(d)-(f); Social

8   Security Ruling ("SSR") 96-5p).

9        None of the legal sources plaintiff cites to, however, stand for the proposition plaintiff asserts they

10   do.  Rather, they merely lay out the standards for reviewing opinion source evidence from acceptable

11   medical sources.  See 81 F.3d at 830-31.  While plaintiff certainly could argue the ALJ did not meet those

12   standards in regard to each of those ten examining and non-examining medical sources referred to in her

13   brief, she has not done so here – other than with respect to the two examining medical sources discussed

14   below – let alone with any specificity.  In addition, while it may be unusual for an ALJ to reject all, or

15   nearly all of the medical opinion source evidence before him or her, that in itself does not mean valid

16   reasons for doing so were not preferred or that such rejection was improper. See, e.g., Batson, 359 F.3d at

17   1195 (ALJ need not accept treating physician opinion if it is brief, conclusory, and inadequately supported

18   by clinical findings or by record as whole).

19        A.    Dr. Beibuyck

20        Richard Biebuyck, M.D., evaluated plaintiff in late April 2001.  On mental status examination,

21   plaintiff's thought processes were linear and goal directed, and she denied any current psychotic symptoms

22   or suicidal or homicidal ideation. Tr. 176.  While plaintiff's eye contact was intermittent and her affect was

23   blunted, she was oriented, and her memory, fund of knowledge and concentration were all intact. Tr. 176-

24   77.  Dr. Biebuyck diagnosed her with a moderate, chronic major depressive disorder, without psychotic

25   features, and a global assessment of functioning ("GAF") score of 65. Tr. 177-78.  In terms of plaintiff's

26   prognosis and functional assessment, Dr. Biebuyck further opined as follows:

27        The claimant does have symptoms consistent with a major depressive disorder, chronic.
          She has a history of suicide attempts.  She has a history of recent passive suicidal and
28        homicidal ideation.  She is not currently receiving any mental health counseling.  She is
          on an antidepressant, but is still having significant major depressive symptoms.  I

believe that she has a fair chance of improvement over the next 12 months, if she continues to be compliant with her medication and ideally receive [sic] outpatient mental health counseling.

. . . Her intellectual functioning was intact just per my interview. Based on this I believe that she has the capability of managing her funds if given. She was able to perform simple and repetitive tasks. Detailed or complex tasks were not measured in this interview. The claimant was able to interact with me appropriately throughout the interview. She reported a history of not getting along well with co-workers. She reported a history of intermittent homicidal ideation directed toward co-workers. Based on this, I believe that she may have some difficulty interacting with co-workers and the public. She stated that she has never acted on any homicidal ideation. She has a history of multiple jobs in the past. Her longest job activity was approximately four years. I believe that she has the potential to perform work activities on a consistent basis. However, she described her depressive symptoms as interfering with her ability to maintain work in the past. I believe that she may benefit from additional supervision in the workplace. It is unclear if she could maintain a full-time job with her depressive symptoms, as she described them to me. I believe that she would be at some risk for decompensation in terms of increased depression and perhaps suicidal ideation, with the usual stress encountered in a competitive work environment, at the moment. She may benefit from a consul with DVR [Division of Vocational Rehabilitation]. I believe that this claimant may be able to work full-time in the future, but it's unclear whether she can do so with her current symptoms.

Tr. 178.

The ALJ addressed the findings and opinion of Dr. Biebuyck as follows:

The doctor did not elaborate on exactly which symptoms would prevent the claimant from maintaining employment, nor did he explain how the claimant's reported symptoms were confirmed on mental status examination. Furthermore, Dr. Biebuyck assessed a GAF score of 65, which indicates that the claimant had only some mild symptoms or some difficulty in social, occupational, or school functioning, but was generally functioning pretty well, with some meaningful interpersonal relationships. *See The Diagnostic and Statistical Manual of Mental Disorders* at 32 (4th ed. 1994). Because Dr. Biebuyck's assessment is based on the claimant's subjective complaints alone and not borne out by objective testing and because his ultimate conclusion was contradicted by his own assessment of the claimant's GAF, I decline to give the doctor's claims about the claimant's ability to perform work related activities any significant weight.

Tr. 414.

Plaintiff argues the ALJ erred by stating that Dr. Biebuyck's opinion was based on her subjective complaints only and not supported by objective testing. Specifically, plaintiff asserts Dr. Biebuyck based his opinion on both the mental status examination he conducted and on her own reports. Thus, plaintiff claims the ALJ's findings are not supported by substantial evidence. The undersigned, however, finds no error here. It is true that the report issued by Dr. Biebuyck contained objective findings in the form of a mental status examination. The ALJ, however, properly determined that those findings did not support Dr. Biebuyck's ultimate conclusion regarding plaintiff's ability to work. This was a valid basis for rejecting

1  that opinion. See Batson, 359 F.3d at 1195 (ALJ need not accept opinion of treating physician if it is brief,

2  conclusory, and inadequately supported by clinical findings or by record as whole).

3       Plaintiff next argues the ALJ erred in discounting Dr. Biebuyck's opinion because of the relatively

4  high GAF score assessed.  A GAF score, plaintiff asserts, has no direct correlation to the criteria for mental

5  impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  Be this as it may, a GAF

6  score – while perhaps not appropriate for consideration of whether a claimant is disabled at step three of

7  the sequential disability evaluation process – still constitutes relevant evidence the ALJ may consider in

8  assessing the claimant's residual functional capacity. England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir.

9  2007) (GAF score is relevant evidence of claimant's ability to function mentally).  Indeed, Dr. Biebuyck's

10  findings and opinion were discussed in the section of the ALJ's decision devoted to assessing plaintiff's

11  residual functional capacity.  As such, there is no error here.

12       Plaintiff argues though that even assuming it was not improper for the ALJ to have considered the

13  GAF score Dr. Biebuyck assessed, the more specific limitations he found are of greater utility.  As noted

14  by the ALJ, however, those limitations were not adequately supported by the objective findings contained

15  in Dr. Biebuyck's report.  For example, plaintiff's mental status examination was largely unremarkable.

16  Tr. 176-77.  Dr. Biebuyck himself found plaintiff's intellectual functioning to be intact, and noted that she

17  was able to interact appropriately throughout the interview. Tr. 178.  Also as pointed out by the ALJ,

18  plaintiff's ability to perform detailed or complex tasks was not measured by Dr. Biebucyk. Id.  Read in

19  conjunction with these objective findings, the ALJ was not remiss in finding the GAF score of 65 was a

20  fair reflection of plaintiff's ability to function at the time of Dr. Biebuyck's evaluation of her.

21       Finally, it must be noted that the opinion of a physician premised to large extent on a claimant's

22  own accounts of her symptoms and limitations, may be disregarded where those complaints have been

23  properly discounted. See Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595,

24  601 (9th Cir. 1999).  As discussed below, the ALJ did not err in discounting plaintiff's credibility.  As

25  explained above, the ALJ properly found the objective findings in Dr. Biebuyck's report did not support

26  his ultimate opinion.  Given the lack of such support, and that it appears most, if not all, of Dr. Biebuyck's

27  comments regarding plaintiff's work-related limitations were based on plaintiff's self reports, the ALJ also

28  correctly found Dr. Biebuyck's opinion regarding plaintiff's ability to work to have been largely based on

her own subjective complaints.  Thus, again, no error was committed here.

1      B.      Dr. Brzezinski-Stein

2          In late March, 2004, plaintiff was evaluated by Katherine Brzezinski-Stein, Ph.D., who diagnosed

3  her with a recurrent, severe major depressive disorder, with psychotic features, a generalized social phobia,

4  a schizoid personality disorder, and a GAF score of 50. Tr. 329.  On mental status examination, plaintiff

5  showed no psychomotor agitation or retardation, her thoughts were clear, coherent and well-organized, and

6  her stream of mental activity was within normal limits. Tr. 328.  While her affect was dysphoric,she had a

7  significant suicide history, and reported panic episodes "under pressure," plaintiff denied recent suicidal

8  ideation, she experienced no symptoms of post traumatic stress, and it appeared she had never had a manic

9  or hypomanic episode. Id.

10         Plaintiff was oriented, her memory was intact and her fund of knowledge was reasonably adequate.

11  Tr. 328-29.  Although her practical judgment was "very poor" and her insight appeared limited, plaintiff's

12  attentional skills were only "mildly impaired," and she had "little difficulty tracking in conversation." Tr.

13  329.  In addition, Dr. Brzezinski-Stein stated as follows:

14          Despite her impairments, Ms. Long's immediate, recent, and remote memory functions
            appeared to be quite intact.  Common courtesy and basic manners were good in spite of
15          her social phobia.  Ms. Long also presented a good appearance from the standpoint of
            grooming and hygiene.
16
17  Tr. 330.  Nevertheless, Dr. Brzezinski-Stein considered plaintiff's "current prognosis for return to full time

    competitive employment" to be only guarded, noting her major depressive disorder and generalized social
18
    phobia remained "severe despite mental health treatment." Tr. 330.
19
20         Dr. Brzezinski-Stein evaluated plaintiff again in late August 2006, once more diagnosing her with a

21  recurrent, severe major depressive disorder, without psychotic features, a generalized social phobia, and a

22  schizoid personality disorder. Tr. 458.  This time, however, Dr. Brzezinski-Stein also diagnosed plaintiff

23  with a panic disorder with agoraphobia and a GAF score of 47. Id.  While mild psychomotor retardation

24  was noted, plaintiff's thoughts were clear, coherent and well-organized, her stream of mental activity was

25  within normal limits, and her memory was intact. Tr. 456-57.  Plaintiff admitted recent suicidal ideation,

26  but denied current intent. Tr. 457.  She also was oriented and her fund of knowledge appeared intact, as did

    her attentional skills. Id.
27
28         Plaintiff, furthermore, had "no difficulty . . . following a 3-step command," and "had little apparent

    difficulty tracking in conversation." Id.  On the other hand, as before, her practical judgment was found to

be "very poor," and her insight appeared limited. Id.  Again, Dr. Brzezinski-Stein further found that:

> Despite her impairments, Ms. Long exhibited quite adequate attentional and memory functions as well as some competence at verbal reasoning. Although socially phobic, common courtesy and basic manners were quite good.  Ms. Long also presented a good appearance from the standpoint of grooming and hygiene.

Id.  Once more, however, Dr. Brzezinski-Stein nevertheless believed plaintiff's current prognosis for return to full-time competitive employment to be "quite guarded," noting that her major depressive disorder, generalized social phobia, and panic disorder remained severe, and that she was "no longer receiving any type of medical or mental health treatment for them." Tr. 458.

The ALJ assessed Dr. Brzezinski-Stein's two opinions as follows:

> Dr. Brzezinski-Stein assessed a GAF score of 50 at the first evaluation, 47 at the second. Ex 17F/3. These scores indicates [sic] that the claimant had serious symptoms or a serious impairment in social, occupational, or school functioning. *See The Diagnostic and Statistical Manual of Mental Disorders* at 32 (4th ed. 1994).  The doctor found a "social phobia," but did not assess the claimant's functioning in either of her so-called medical source statements.  In fact, the only substance to those statements was the doctor's opinion that, despite the claimant's impairments, her memory was intact; despite her social phobia, the claimant's "common courtesy and basic manners" were good; and that the claimant presented "in good appearance from the standpoint of grooming and hygiene." Ex 17F/4, 19F/4.  Without explaining why, Dr. Brzezinski-Stein opined that the claimant's prognosis for returning to full time work was guarded. Her only explanation was to say that the claimant's Axis I conditions remained "severe." Ex 17F/4, 19F/4.  I disagree and find that, much like the doctor herself concluded, the claimant functions well in performing her activities of daily living and in the areas of concentration and persistence.  I agree that the claimant experiences difficulty in new social situations, to the extent that her contact with supervisors and co-workers should be minimal and contact with the general public should be nil.  I do not find, however, that this dooms the claimant's prospects for returning to full time work, as found by Dr. Brzezinski-Stein.  Inasmuch as that evaluator found that the claimant was disabled (without justifying such a conclusion or evaluating her functioning in any meaningful way), I find that that doctor's opinions are suspect, as they were solicited by the claimant's counsel, in his very specific pursuit of proving her allegations of disability. *See Saelee v. Chater*, 94 F.3d 520, 522-23 (9th Cir. 1996) (noting that a finding that a solicited report was untrustworthy was a permissible credibility determination on the part of the administrative law judge).  As noted in my previous decision, this evidence is certainly legitimate and deserves due consideration; however, the context in which it was produced cannot be entirely ignored. *See* Ex 5A/12.

Tr. 416.

Plaintiff argues that substantial evidence does not support the ALJ's rejection of Dr. Brzezinski-Stein's opinions.  Specifically, plaintiff asserts the ALJ erred in discounting those opinions on the basis that they were obtained by plaintiff's counsel.  The undersigned agrees that an ALJ may not discount an examining physician's solely on the basis that it was solicited by plaintiff's counsel. See Lester, 81 F.3d at

832 (physician's findings are entitled to no less weight when examination is procured by claimant than when obtained by Commissioner).  Nevertheless, the undersigned finds the ALJ did not err in rejecting the opinions of Dr. Brzezinski-Stein regarding plaintiff's limitations based in part on the fact that they were solicited by plaintiff's counsel.

Where the medical opinion itself "provides grounds for suspicion as to its legitimacy," the fact that the opinion was conducted at the request of a claimant's attorney is relevant. Nguyen v. Chater, 100 F.3d 1462, 1464 (9th Cir. 1996).  For example, "the source of a referral" is relevant "where there is no objective medical basis for the opinion." Id. (citing Burkhart v. Bowen, 856 F.2d 1335, 1339 (9th Cir. 1988)).  It also is relevant "where there is evidence of 'actual improprieties' on the part of the doctor whose report the ALJ chooses to reject." Id. (citing Saelee, 94 F.3d at 523); see also Lester, 81 F.3d at 832.  The Ninth Circuit in Nguyen went on to discuss those instance when it has found consideration of the opinion's referral source to be proper:

> In *Saelee*, the ALJ noted among other things that there was no objective medical basis for the doctor's opinion and that the report was inconsistent with the doctor's own treatment notes. *Id.  Saelee* relied on *Burkhart* for the proposition that under certain circumstances the ALJ may consider the purpose for which a doctor's report was obtained.  In *Burkhart*, we held that consideration of the fact that a doctor's report was solicited by claimant's counsel was "a permissible credibility determination *given the evidence before the ALJ*." *Burkhart*, 856 F.2d at 1339 (emphasis added).  In that case, the evidence before the ALJ was that the report of the doctor that the ALJ rejected consisted of no more than a wholly conclusory opinion unsupported by any objective medical findings, personal observations or test reports, and was directly contradicted by the conclusions of a number of other treating physicians whose opinions were based on objective medical findings. *Id.*

100 F.3d at 1464-65 (finding that physician's opinion was not mere unsupported medical opinion and that there was no evidence of actual improprieties); see also Reddick v. Chater, 157 F.3d 715, 726 (9th Cir. 1998) (clarifying that in absence of other evidence to undermine medical report's credibility, purpose for which report was obtained does not provide legitimate basis for rejecting it).

Here, the source of the referral for Dr. Brzezinski-Stein's opinions was only one of the reasons the ALJ gave for rejecting those opinions.  In addition, the ALJ noted that while Dr. Brzezinski-Stein found plaintiff had a severe social phobia, she herself conducted no assessment of plaintiff's functioning in that area, other than apparently plaintiff's own self reports. See Tr. 457.  The ALJ further noted the apparently conflicting observation that despite this severe impairment, plaintiff's common courtesy and basic manners were "quite good," as was her grooming and hygiene.  The ALJ also pointed out that Dr. Brzezinski-Stain

1  failed to provide any explanation as to why she felt plaintiff's prognosis was poor.  Finally, the ALJ noted

2  correctly that the record revealed plaintiff functioned well in performing her activities of daily living –

3  which shall be addressed in greater detail below regarding plaintiff's credibility assessment – and in the

4  areas of concentration and persistence, as Dr. Brzezinski-Stein herself found.  Id.  This lack of a objective

5  medical basis for Dr. Brzezinski-Stein's opinions thus made their referral source relevant.

6  II.    The ALJ's Step Three Analysis

7         At step three of the sequential disability evaluation process, the ALJ must evaluate the claimant's

8  impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P,

9  Appendix 1 (the "Listings").  20 C.F.R § 404.1520(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir.

10  1999).  If any of the claimant's impairments meet or equal a listed impairment, he or she is deemed

11  disabled.  Id.  The burden of proof is on the claimant to establish he or she meets or equals any of the

12  impairments in the Listings.  Tacket, 180 F.3d at 1098.

13         A mental or physical impairment "must result from anatomical, physiological, or psychological

14  abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."

15  20 C.F.R. § 404.1508.  It must be established by medical evidence "consisting of signs, symptoms, and

16  laboratory findings."  Id.  An impairment meets a listed impairment "only when it manifests the specific

17  findings described in the set of medical criteria for that listed impairment."  SSR 83-19, 1983 WL 31248

18  *2.  An impairment equals a listed impairment "only if the medical findings (defined as a set of symptoms,

19  signs, and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed

20  impairment."  Id. at *2.  However, "symptoms alone" will not justify a finding of equivalence.  Id.

21         As noted above, the ALJ determined that none of plaintiff's impairments met or equaled the criteria

22  of any of those contained in the Listings.  Specifically, the ALJ found as follows:

23         Based on my review of the medical evidence, I find that none of the claimant's mental
           impairment [sic] meets or medically equals [sic] the *B* criteria[3] of any of the listings
24         included under 12.00 [mental disorders] of the *Listing of Impairment*.  Her impairments

25         _____

26         [3]With respect to each mental disorder contained in the Listings, 20 C.F.R. Part 404, Subpart P, Appendix 1, §12.00A states
           as follows: "Each listing, except 12.05 and 12.09, consists of a statement describing the disorder(s) addressed by the listing,
           paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations). There
27         are additional functional criteria (paragraph C criteria) in 12.02, 12.03, 12.04, and 12.06 . . . We will assess the paragraph B criteria
           before we apply the paragraph C criteria. We will assess the paragraph C criteria only if we find that the paragraph B criteria are
28         not satisfied. We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the
           criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied."

cause only mild restrictions in performing activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, and pace.  The evidence fails to establish that the claimant has ever experienced decompensation to the degree contemplated in the listing.  There is also no evidence of the *C* criteria.  I therefore find that the claimant's mental health impairments fail to meet or medically equal the severity of any impairment listed in section 12.00 of the *Listing of Impairments*.

My findings differ from the opinions of the state agency medical consultants with Disability Determination Services (DDS), who reviewed the record in connection with the initial and reconsideration determinations and found that her impairments did not meet the listings.  *See* Ex 8F, 13F.  I note that the consultants found moderate limitations in all 3 domains of the *B* criteria under listing 12.04 in their first evaluation.  *See* Ex 8F/11.  In the second, they found no restrictions in the claimant's activities of daily living, marked restrictions in her social functioning, and moderate limitations in her ability to maintain concentration, persistence, or pace, with 1-2 episodes of decompensation of extended duration.  I see no reason to find such limitations in the claimant's activities of daily living or concentration, persistence, or pace.  Neither Dr. Biebuyck nor Dr. [Linda] Miller found any limitation in the claimant's activities of daily living, nor did the claimant claim any such limitations when she saw these evaluators.  And in the second evaluation, the DDS clinicians found no limitations. Ex 13F/11.  Furthermore, these providers found no limitations in the claimant's concentration, persistence, or pace; in fact, Dr. Miller judged the claimant's functioning in these domains as "good." *See* Ex 6F/4.  I also note that the same consultants performed the MRFCA [Mental Residual Functional Capacity Assessment] and PRTF [Psychiatric Review Technique Form] analyses, on the same dates, in the first evaluations.  Yet in the mental health residual functional capacity assessment, the consultants made no mention of the claimant's alleged moderate limitation in performing activities of daily living and failed to assign a work related limitation to this alleged problem.  Because there is no evidence to support the moderate limitations found by the DDS consultants and because the reviews of the evidence performed on the same day are not consistent with the others, I give the PRTF analysis little weight.

I note that my conclusions also differ from those of Dr. Asher [the medical expert who testified at the second hearing], who found that the claimant's functioning met the *B* criteria under listing 12.00.  I give little weight to Dr. Asher's opinion.  First, as noted above, the doctor essentially manufactured a PTSD diagnosis, with no support whatsoever in the record.  The record shows that the claimant spoke more than once of a traumatic event that occurred when she was a child; yet none of her evaluators diagnosed PTSD, including Dr. Brzezinski-Stein who mentioned the potential of that condition resulting from the event, but found no actual evidence of it.  Second, Dr. Asher found from his review of the evidence that the claimant had experienced episodes of decompensation, noting that she lived in a "fragile balance," in which not too many demands were made of her.  I heartily disagree with this assessment of the claimant's living situation.  Granted, she does not have the responsibility of a job, but her responsibilities of running her own home, taking care of her elderly and ailing mother, caring for her mother's home, and caring for their animals and property arguably put greater demands on her than would be placed with a job.  Indeed, a fair reading of this record is that the claimant ceased employment to return home and care for her ailing parents and their estate.  The claimant alleges periods when her performance slacked, but it is doubtful, given to the nature of her responsibilities and the dependence of her mother and their numerous animals, that such periods lasted any significant length of time.  As discussed more thoroughly below and in my prior decision, the claimant is very active, enjoys being active, and must remain active, due to the nature of her living situation and demands of her family.  I find that Dr. Asher completely missed the significance of the claimant's contemporaneous reports and

hearing testimony in describing the very active life the claimant has led during the period at issue. For these reasons, I give little weight to that doctor's assessment of the claimant's impairments and functioning.

In this regard I also note that it is far from clear that the claimant's report of losing jobs due to her social anxiety are accurate. She kept several jobs for years, including the teaching assistant job and the expresso [sic] stand (which she left when it was sold), and essentially swapped seasonal jobs for a couple of years, returning to the summer job after the winter one ended. As such, I do not find these job losses were the result of "decompensation", but rather simply changes in jobs due to external circumstances.

Given the assessment of the *B* criteria addressed above, I conclude that none of the claimant's mental health impairments meets or medically equals [sic] any of the listings included in section 12.00. *See* 20 C.F.R. § 404, Appendix 1 to Subpart P.

I further find that none of the claimant's other impairments meets or equals [sic] the criteria of nay impairment included in the *Listing of Impairments*.

Tr. 408-09.

Plaintiff argues substantial evidence does not support the ALJ's step three findings, because he did properly reject Dr. Asher's testimony regarding Listing 12.04C. With respect to the B criteria for Listing 12.04 (affective disorders), Dr. Asher testified at the hearing that plaintiff was moderately impaired in her activities of daily living, markedly impaired in her social functioning and moderately impaired with respect to concentration, persistence or pace. Tr. 511-12. Dr. Asher further testified that he was not aware of any episodes of decompensation. Tr. 512. Plaintiff correctly notes that the ALJ erred in finding such testimony amounted to a finding by Dr. Asher that the Listing 12.04B criteria had been met. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04B. Plaintiff, however, does not argue the ALJ's decision should be reversed on this basis. Rather, she argues the ALJ should have adopted Dr. Asher's 12.04C testimony, or, at the very least, expressly analyzed that testimony.

Listing 12.04C reads as follows:

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04C.  In response to the ALJ's question as to whether plaintiff

met the C criteria of Listing 12.04, Dr. Asher testified as follows:

> 12.04.  Repeated episodes of decompensation each of extended duration.  I don't think
> so.  That doesn't quite reach that criteria.  But Number 2 and maybe Number 3,
> especially Number 2, residual disease process resulting in such marginal adjustment
> that even a minimal increase of (INAUDIBLE) or change in environment would cause
> decompensation.  I think this is the case.  She's living in a fragile balance.  She has
> support from family.  She's living in a fairly non demanding [sic] environment.  Even
> in that circumstance, sometimes she doesn't, can't handle it.  So if the demands on her
> abilities were to increase or if the environment were to become less supportive for
> whatever reason, I think this would create a crisis.

Tr. 513.

     The undersigned agrees that the ALJ failed to specifically address Dr. Asher's testimony regarding

Listing 12.04C.  Rather, it appears his above step three analysis focused almost exclusively on the

evidence in the record concerning the B criteria of Listing 12.04.  This was error.  While it is not clear that

the ALJ actually was required to adopt that testimony, given that no other medical source in the record has

so found the C criteria have been met, he had a duty to consider and evaluate it.  See Tonapetyan v. Halter,

242 F.3d 1144, 1150 (9th Cir. 2001) (ALJ has duty to fully and fairly develop record).  In addition, to the

extent that the ALJ felt Dr. Asher had provided insufficient support for his testimony, and it appeared

unclear from the record as a whole whether that testimony was supported by substantial evidence, he had a

duty to conduct further inquiry into the matter.  See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001)

(ALJ's duty to further develop record triggered when there is ambiguous evidence or when record is

inadequate to allow for proper evaluation of evidence).

III.    The ALJ's Assessment of Plaintiff's Credibility

     Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d

639, 642 (9th Cir. 1982).  The Court should not "second-guess" this credibility determination.  Allen, 749

F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is

based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a

claimant's testimony should properly be discounted does not render the ALJ's determination invalid, so

long as that determination is supported by substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1148

(9th Cir. 2001).

     To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for

1  the disbelief." <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must

2  identify what testimony is not credible and what evidence undermines the claimant's complaints." <u>Id.</u>;

3  <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is

4  malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."

5  <u>Lester</u>, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering.  <u>O'Donnell v.</u>

6  <u>Barnhart</u>, 318 F.3d 811, 818 (8th Cir. 2003).

7      In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

8  evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

9  testimony that "appears less than candid." <u>Smolen v. Chater</u>, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

10  also may consider a claimant's work record and observations of physicians and other third parties

11  regarding the nature, onset, duration, and frequency of symptoms. <u>Id.</u>

12      Plaintiff argues that substantial evidence does not support the ALJ's determination that she is not

13  full credible. Tr. 411.  The undersigned disagrees.  The ALJ provided several valid reasons for discounting

14  plaintiff's credibility.  For example, the ALJ discounted plaintiff's credibility in part because of the nature

15  and extent of the activities of daily living she performed:

16      At the hearing, the claimant testified that she cared for many animals, including 9 dogs,

17  goats, and a horse, and sold puppies regularly.  She reported that, because she did not
    like talking to prospective buyers of the puppies, she sold them through the newspaper
    or over the internet.  The claimant claimed that she spent a minimal amount of time on

18      this enterprise.  She explained that she was not a "business," and preferred to sell
    puppies than be on GAU.  The claimant reported that she also used to look at pets and

19      Craig's List, but did not do that anymore.  She testified that currently on a typical day
    she go up and took care of her animals.  She then went to visit her mother and prepared

20      dinner.  She reported that she helped her mother, who was 72 at the time of the hearing,
    to cut and split wood for heat.  In the summers they canned.  The claimant reported that

21      she took her mother shopping, driving a distance of approximately 20 miles.  The
    claimant reported that she dealt with the cashier, but claimed that sometimes she had to

22      leave before they were done if she ran into unfriendly people.  The claimant testified
    that, even when isolating socially, she talked to her mother on the phone.  She reported

23      that she also talked regularly with a friend on the phone.  The claimant reported that she
    sculpted, drew, and on rare occasions painted.  She reported doing a variety of crafts.

24      She then claimed that she did not always stay on task.  It is clear from previous reports
    in the record and from the testimony at the first hearing that the claimant performs even

25      more work for her mother than she admitted at the recent hearing.  By the claimant's
    own report, she is able independently to perform all of her own household chores,

26      including cleaning, cooking, shopping, driving, and self-care, as well as care for her
    mother. Ex 5/11.  As noted in my previous decision, the claimant also enjoyed hiking

27      (Ex 16F/43), cross stitch, other crafts, surfing internet sites, going to the movies,
    watching television, and maintaining the acreage property on which she lived with her

28      mother. *See* Ex 5A/11.  All of these activities show that the claimant is independent in
    her activities of daily living; is able to interact socially with people she knows to one

degree or another (see: Ex 16/f/45) and has no significant limitations in her concentration, persistence, or pace.  While the claimant claimed at the recent hearing that she no longer did some things, such as visit Craig's List, it is significant that the claimant's mother testified at the first hearing that she was an invalid and nearly blind. The very nature of her mother's eye condition is degenerative; therefore, over time she would require more help from the claimant.  The claimant reported at her last hearing that her sister had moved to Illinois, and she did not allege that her mother received help from anyone else but herself.  It is thus clear that the claimant alone takes care of her own household, her animals, or mother's household and other needs.

Tr. 411-12.

To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284.  Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7.  The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." Id.

Plaintiff argues the ALJ's analysis failed to recognize that her activities were not performed at the pace of competitive employment, were interspersed with rest, and were largely performed in isolation from persons other than her own family.  While this is true to some extent (see Tr. 107, 135, 140, 143, 329, 457), other evidence in the record for the most part shows she was more active, socially and otherwise, than she now is alleging (see Tr. 106-07, 135-36, 140-42, 175, 200, 204, 224, 329, 457.).  In addition, contrary to plaintiff's assertion, the undersigned finds the nature and extent of the activities the record shows she has engaged in are to a fairly large extent transferable to a work setting.  As such, the undersigned also finds the ALJ did not err in discounting plaintiff's credibility for this reason.

The ALJ also discounted plaintiff's credibility in part for the following reason:

It also appears from my review of the record that the claimant is not committed to treatment.  In October of 2001, the claimant admitted that she ran out of her antidepressant medication 1-2 weeks after her last visit and so had not been off all medications.  She mentioned trying to get on disability and reported that she had had an evaluation for that recently. Ex 5F/2.  It is not clear from the record to which evaluation the claimant referred in that visit.  But it is significant that, although prescribed Paxil at that October of 2001 visit, the claimant again admitted on consultative examination with Dr. Miller in December 2001 that she was taking no psychotropic medications at that time. See Ex 6F/2.  In August of 2002, the claimant told Dr. [Leslie E.] Postovoit that her doctors treated her as though she was not trying, with regard to her medications, but she then complained that Effexor, for instance, had too many side effects. Ex 10F/2.  In January and February of 2003 the claimant reported that she felt very well on Welbutrin.  But she subsequently stopped taking this medication, for reasons that are not clear from the record.  In July of 2003, the claimant's family practice doctor noted that the claimant had a history of noncompliance with

1  medications. Ex 16F/43.[4]

2  Tr. 413.  Failure to assert a good reason for not following a prescribed course of treatment, or a finding

3  that a proffered reason is not believable, "can cast doubt on the sincerity of the claimant's pain testimony."

4  Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).  Here, while there is evidence in the record that plaintiff

5  did not continue with her prescribed course of treatment at times due to financial issues or severe side

6  effects (see Tr. 220-21, 266, 333-34, 456, 458), other evidence in the record, including that noted above,

7  either indicates otherwise or fails to show a reason as why she did not do so (see Tr. 178, 189, 198, 200,

8  220-21, 227, 229, 285, 313, 336).  Regardless, plaintiff has not challenged this basis for the ALJ's

9  discounting of her credibility, and, in any event, an ALJ's credibility determination may not be reversed

10  where it is based on contradictory or ambiguous evidence. See Allen, 749 F.2d at 579.

11      The ALJ further discounted plaintiff's credibility due to certain inconsistencies in the reports she

12  gave regarding her symptoms:

13          For example, as noted above, the claimant told at least 3 of her evaluating clinicians
          that she heard voices at night before falling asleep.  Dr. Miller even diagnosed
14          psychosis, not otherwise specified, based on these allegations.  And the claimant
          subsequently told Dr. Brzezinski-Stein that she heard muffled voices at night.  But at
15          the hearing, the claimant denied hearing any voices since working for Toys R Us,
          which was before the period at issue.  Although the inconsistent information provided
16          by the claimant may not be the result of a conscious intention to mislead, nevertheless
          they suggest that the information provided by the claimant generally may not be
17          entirely reliable.

18  Tr. 413.  This is a valid reason for discounting a claimant's credibility. See Smolen, 80 F.3d at 1284 (ALJ

19  may consider prior inconsistent statements concerning symptoms).  The ALJ thus did not err in

20  discounting plaintiff's credibility for this reason here.

21      Lastly, the ALJ discounted plaintiff's credibility in part for the following reason:

22          At the hearing, the claimant testified that she has been unable to work since January 31,
          2001.  Her last job was as a flagger, and she claimed that her performance at that time
23          was hindered by her depressive symptoms and the fact that she did not feel that she was
          part of the team.  She explained that she was ostracized by the other workers, who were
24          cliquish.  She further stated that the environment on the job was "lax."  She explained
          that one time she was reprimanded after not getting all of the required information
25          about a site, which made her feel futile and hopeless.  My impression of this testimony
          is that the claimant left this job because she did not like her co-workers and did not like
26          the job, not because of limitations caused by her impairments.  The claimant explained
          that her earlier job at Toys R Us had ended with her volunteering to quit when
27          management asked for voluntary resignations.  As noted above that this job, as well as

28

      _____

          [4]The correct exhibit cite is actually 16F/44 (Tr. 313).

REPORT AND RECOMMENDATION
Page - 17

several of her other jobs, appears also to have ended for reasons other than a physical or mental impairment. *See* Ex 5A/11.

Tr. 411.  In so finding, however, the ALJ appears to be downplaying the weight of evidence in the record indicating that most of plaintiff's mental health problems concern social functioning and interacting with other people, including feelings of paranoia.  Indeed, much of plaintiff's reports regarding her reasons for leaving her past jobs highlight those issues.  See Tr. 108, 140, 174, 222, 327, 455-56, 475-77.  Therefore, this was not a valid basis for discounting plaintiff's credibility.  Nevertheless, the fact that one reason for discounting plaintiff's credibility was improper, does not render the ALJ's overall credibility determination invalid, as long as that determination is supported by substantial evidence in the record, as it is in this case. Tonapetyan, 242 F.3d at 1148.

Plaintiff argues the ALJ's credibility determination cannot stand because he erroneously evaluated the medical evidence in the record.  A determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998).  However, a claimant's pain testimony may not be rejected "solely because the degree of pain alleged is not supported by objective medical evidence." Orteza v. Shalala, 50 F.3d 748, 749-50 (9th Cir. 1995) (quoting Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir.1991) (en banc)) (emphasis added).  The same is true with respect to a claimant's other subjective complaints.  See Byrnes v. Shalala, 60 F.3d 639, 641-42 (9th Cir. 1995) (finding that while holding in Bunnell was couched in terms of subjective complaints of pain, its reasoning extended to claimant's non-pain complaints as well).

As discussed herein, the only medical evidence in the record the ALJ erred in evaluating was the testimony of Dr. Asher concerning the C criteria of Listing 12.04.  It is not clear though that this error is sufficient to prevent the ALJ from discounting plaintiff's credibility on the basis of inconsistencies with other medical evidence in the record, given that this particular testimony from Dr. Asher dealt only with the determination to be made at step three of the disability evaluation process.  Regardless, it certainly is possible for an ALJ to err in evaluating the medical evidence in the record, while at the same time properly discount a claimant's credibility.  This is particularly true where, as here, the ALJ discounts a claimant's credibility not because of inconsistencies with the medical evidence in the record, but for other valid stated reasons.  As such, plaintiff's argument is without merit.

REPORT AND RECOMMENDATION
Page - 18

1  IV.   The ALJ's Step Four Analysis

2       If a disability determination "cannot be made on the basis of medical factors alone at step three of

3  the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

4  assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A

5  claimant's residual functional capacity assessment is used at step four of the sequential disability

6  evaluation process to determine whether he or she can do his or her past relevant work. Id.  Plaintiff has

7  the burden at step four to show that she is unable to return to her past relevant work. Tackett v. Apfel, 180

8  F.3d 1094, 1098-99 (9th Cir. 1999).

9       A claimant's residual functional capacity is the maximum amount of work the claimant is able to

10  perform based on all of the relevant evidence in the record. SSR 96-8p, 1996 WL 374184 *2.  It is what

11  the claimant "can still do despite his or her limitations." Id.  However, a claimant's inability to work must

12  result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those

13  limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

14  claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

15  related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

16  medical or other evidence." Id. at *7.

17       Here, the ALJ assessed plaintiff's residual functional capacity as follows:

18       [T]he claimant can perform at least the demands of "medium" work under there [sic]
19       regulations, with minimal contact with co-workers, limited contact with supervisors,
         and no contact with the general public.  Because of her reactive airway
20       disease/allergies, she must work in a clean air environment.

21  Tr. 410.  At the second hearing, the hypothetical question the ALJ posed to the vocational expert consisted

22  in relevant part of the following:

23       Equivalent to high school education.  Past work is that as described. . . . exertionally
         there really isn't anything to get much below medium.  And the problem really here is
24       getting along with others so it's absolutely minimal coworker contact. . . . Probably not
         well with extra supervision either.  And generally clean area, for lack of a better
25       definition, an OSHA legal facility with air (INAUDIBLE) capacities.

26  Tr. 514.  In response to this hypothetical question, the vocational expert testified that an individual with

27  those abilities and limitations could perform two of plaintiff's past jobs, that of stock clerk (Dictionary of

28  Occupational Titles ("DOT") 299.367-014), horticultural worker (DOT 405.687-014) and flagger (DOT

372.667-022). Tr. 514-15.  Based on the vocational expert's testimony, the ALJ found plaintiff could

return to the jobs of stock clerk and horticultural worker. Tr. 417.

Plaintiff argues substantial evidence does not support the ALJ's step four findings here, because the vocational expert's testimony departed from the descriptions contained in the DOT of the two jobs of stock clerk and horticultural worker without justification. The undersigned agrees. The ALJ has the affirmative responsibility to ask the vocational expert about possible conflicts between his or her testimony and the information in the DOT. Haddock v. Apfel, 196 F.3d 1084, 1091 (10th Cir. 1999); SSR 00-4p, 2000 WL 1898704. Thus, before relying on evidence obtained from a vocational expert to support a finding of not disabled, the ALJ must "elicit a reasonable explanation for any discrepancy" with the DOT. Haddock, 196 F.3d at 1087; SSR 00-4p, 2000 WL 189704 *1. The ALJ also is required to explain in his or her decision how the discrepancy or conflict was resolved. SSR 00-4p, 2000 WL 189704 *4.

The descriptions of the jobs of stock clerk and horticultural worker contained in the DOT require the ability to perform "heavy" work, which is defined therein as:

> Heavy Work - Exerting 50 to 100 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) and/or 10 to 20 pounds of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Medium Work.

DOT 299.367-014; DOT 405.687-014. As pointed out by plaintiff, while the vocational expert noted that those two jobs had this exertional requirement (Tr. 514), the hypothetical question the ALJ posed limited plaintiff to only "medium" work, which is defined as follows:

> Medium Work - Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Light Work.

DOT Appendix C; 20 C.F.R. § 404.1567(c) (medium work defined as involving no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds).

The vocational expert, nevertheless, testified that given the limitation to medium work, the jobs of stock clerk and horticultural worker could be performed. Clearly, this testimony conflicts with the strength descriptions of those jobs contained in the DOT. However, the ALJ never asked the vocational expert whether her testimony conflicted with those descriptions, nor did the ALJ elicit an explanation for that discrepancy or explain how it was resolved. Indeed, it was not resolved. This was error. In addition, given this error, it also was improper for the ALJ to have relied on the vocational expert's testimony to find that plaintiff was capable of returning to the above two jobs.

1    Defendant argues the ALJ was not required to obtain the testimony of a vocational expert at step

2    four of the sequential disability evaluation process.  Be that as it may, the fact is that the ALJ did obtain

3    and rely on such testimony to make his step four determination.  The Commissioner cannot have it both

4    ways.  That is, he cannot call a vocational expert to testify regarding a claimant's ability to return to his or

5    her past relevant work, rely on that testimony to make an adverse step four determination, and than chose

6    to ignore that testimony after it is shown to have been flawed.  The ALJ was the one who chose to obtain

7    vocational expert testimony at this stage of the proceedings.  In addition, the ALJ had the opportunity to

8    resolve any conflicts between the vocational expert's testimony and the job descriptions contained in the

9    DOT, but did not do so.  The error thus is wholly upon the ALJ here.

10   V.    The Hypothetical Question the ALJ Posed to the Vocational Expert

11    An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

12   posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

13   1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

14   medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

15   Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported

16   by the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from

17   that description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th

18   Cir. 2001).

19    Plaintiff argues the above hypothetical question which the ALJ posed to the vocational expert was

20   incomplete, and therefore inaccurate, because it did not include all of the limitations contained in the

21   ALJ's assessment of her residual functional capacity.  As set forth above, the ALJ restricted plaintiff to

22   minimal contact with co-workers, limited contact with supervisors, and no contact with the general public.

23   In the hypothetical question the ALJ posed to the vocational expert, however, there was no restriction

24   regarding limited contact with supervisors.  Instead, the ALJ stated therein that plaintiff probably would

25   not do well with extra supervision.  The undersigned agrees with plaintiff that this is not equivalent to a

26   restriction to limited contact with supervisors.  As plaintiff points out, "[t]he former implies that a person

27   can tolerate normal supervision, while the latter implies that he or she cannot" do so. (Dkt. #12, p. 10).

28   The latter thus is more restrictive than the former, thereby making the hypothetical question inaccurate.

1   Accordingly, the undersigned finds the ALJ erred here.

2   VI.     This Matter Should Be Remanded for Further Administrative Proceedings

3          The Court may remand this case "either for additional evidence and findings or to award benefits."

4   Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course,

5   except in rare circumstances, is to remand to the agency for additional investigation or explanation."

6   Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in

7   which it is clear from the record that the claimant is unable to perform gainful employment in the national

8   economy," that "remand for an immediate award of benefits is appropriate." Id.

9          Benefits may be awarded where "the record has been fully developed" and "further administrative

10  proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d

11  1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

12         (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's]
           evidence, (2) there are no outstanding issues that must be resolved before a
13         determination of disability can be made, and (3) it is clear from the record that the ALJ
           would be required to find the claimant disabled were such evidence credited.
14
15  Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because

    issues still remain with respect to the testimony of Dr. Asher, whether plaintiff is disabled at step three of
16
    the sequential disability evaluation process, and whether plaintiff is able to perform other jobs existing in
17
    significant numbers in the national economy at step five of that process,[5] this matter should be remanded to
18
    the Commissioner for further administrative proceedings.
19
                                           CONCLUSION
20
21         Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff

22  was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for

23  further administrative proceedings in accordance with the findings contained herein.

24         Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

    the parties shall have ten (10) days from service of this Report and Recommendation to file written
25
    objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those
26
27         [5]If a claimant cannot perform his or her past relevant work at step four of the disability evaluation process, at step five of
    that process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett
28  v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e).  Because the ALJ found plaintiff to be capable of
    returning to her past relevant work at step four, no determination was made as to plaintiff's ability to perform other jobs at step five.

REPORT AND RECOMMENDATION
Page - 22

objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **April 4, 2008**, as noted in the caption.

DATED this 13th day of March, 2008.


Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION
Page - 23